BIG HORN COAL COMPANY,
Plaintiff–Appellee,

v.

COMMONWEALTH EDISON COMPANY, Defendant–Appellant.

BLACK BUTTE COAL COMPANY,
Plaintiff–Appellee,

v.

COMMONWEALTH EDISON COMPANY, Defendant–Appellant.

Nos. 85–1829, 85–1830.

United States Court of Appeals,
Tenth Circuit.

July 28, 1988.

A. Daniel Feldman (John W. Treece and D. Maria Majeske with him on the briefs) of Isham, Lincoln & Beale, Chicago, Ill. (James J. White, Ann Arbor, Mich., of counsel, also with him on the briefs), for defendant-appellant Commonwealth Edison Co.

Donald S. Young (Kathleen McCree Lewis, Jeffrey M. Lipshaw, and Daniel J. Stephenson with him on the brief) of Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich. (George F. Heiden, of counsel, Omaha, Neb., and Bruce A. Salzburg of Freudenthal & Bonds, also with him on the brief), for plaintiffs-appellees Black Butte Coal Co. and Big Horn Coal Co.

Before McKAY and SETH, Circuit Judges, and SAFFELS, District Judge *.

McKAY, Circuit Judge.

This diversity case arises out of long-term coal contracts between an Illinois public utility, Commonwealth Edison Company (Edison), and two Wyoming coal producers, Black Butte Coal Company and Big Horn Coal Company (collectively, the Coal Companies). The coal contracts together call for the supply and purchase of more than 180 million tons of coal through the end of the century. The Coal Companies brought this breach of contract suit when Edison invoked a contract clause to reduce its scheduled purchase obligations. A jury rendered a verdict in favor of the Coal Companies and judgment followed. Edison now appeals, claiming error in the admission of evidence, numerous errors in instructions to the jury and an error in one portion of the judgment.

## I. THE CONTRACTS

On May 13, 1976, Edison entered into a contract with Black Butte (Black Butte Contract) for the purchase of low-sulphur western coal. Under section 3.01 of the Black Butte Contract, Edison agreed to buy and Black Butte agreed to sell a base amount of coal—with a set minimum and maximum quantity—each year for the twenty-year period between 1979 and 1998.[1] Record, vol. 32, exh. 4, at 2–3. The parties agreed that the coal would meet certain specifications, *id.* at 3–4, and anticipated that the coal would be usable at any of Edison's nine coal-fired generating stations. Record, vol. 18, at 138; vol. 20, at 24. Edison was to receive the coal FOB mine and then arrange transportation to one of its nine coal-fired generating stations.

Section 3.01 also contained a provision which allowed Edison to reduce its annual purchase obligations under certain conditions:

If prior to January 1, 1984, Buyer notifies Seller that, due to the requirements of civil or military authorities, it cannot utilize the coal or that continued utilization of the coal would unreasonably delay Buyer's receipt of or prevent Buyer's continued maintenance of any permit, license or variance necessary to the operation of any one or more of the plants at which the coal has been used, without (i) modifying one or more of the plants where such coal has been used (including, but not limited to stack gas treatment systems), (ii) blending the coal with other coal for the purpose of reducing sulphur compound emissions or (iii) using additives, for environmental reasons, Buyer may, upon written notice to Seller, reduce the minimum annual quantities it must purchase during the 10 year period beginning January 1, 1989....

Record, vol. 32, exh. 4, at 3.[2] Section 3.01 has remained unchanged since the original contract was signed in 1976 and, until this suit arose, had not been the subject of litigation between the parties.

The 1976 Black Butte Contract also contained a force majeure provision which reduced the tonnage obligations of the parties if the seller was "reasonably prevented" from complying with the delivery schedule of the contract. Similarly, the force majeure provision reduced or suspended the obligations of the parties if the buyer was "reasonably prevented" from complying with the contract. *Id.* at 23–24.

---

* Honorable Dale E. Saffels, United States District Judge for the District of Kansas, sitting by designation.

1. In early May 1976, a contract between the Idaho Power Company and Black Butte was assigned to Edison. In June 1982, the Idaho Power Company Contract was merged into the Black Butte Contract, and the tonnage requirements were combined. Thus, the Black Butte Contract, as amended in 1982, provided a modified schedule for the annual base amounts of coal which were to be supplied and purchased. The amount by which minimum purchases could be reduced remained constant at 1,500,000 tons but the maximum reduction was raised to 4,470,000 tons. Record, vol. 19, at 16–18; vol. 32, exh. 5, at 1, 4–6.

2. This provision is only the final part of section 3.01; however, the phrase "section 3.01" will refer to the language quoted above, unless otherwise indicated.

In November 1976, Edison also entered into a coal contract with Big Horn (Big Horn Contract) which contained a force majeure provision. The force majeure provision in the Big Horn Contract allowed the parties to reduce the tonnage obligations if either the buyer or the seller was "reasonably prevented" from performing its obligation under the contract. Record, vol. 34, exh. 717, at 27–28.

In the early days of the contracts, Edison was apparently able to defer coal purchases, without invoking the force majeure provisions, by informally telephoning Black Butte or Big Horn and arranging for a later delivery. Record, vol. 19, at 24–25. However, when Edison sought to terminate some of its purchase obligations under the Black Butte Contract following a major coal dust explosion at its Powerton generating station near Peoria, Illinois, Black Butte objected to the use of the force majeure provision, claiming that the explosion was a foreseeable event that Edison could have prevented. In addition, other disagreements arose as Edison discovered difficulties in using Black Butte' coal.

In 1981, these disagreements resulted in litigation between Edison and the Coal Companies in the federal courts of Wyoming and Illinois. See record, vol. 32, exh. 5, at 19–20; vol. 34, exh. 719, at 3–4. The litigation culminated on June 4, 1982, when the parties executed an Amendment and Procedure Agreement for each contract (1982 Amendments). Record, vol. 32, exh. 5 (1982 Amendments and Procedures Agreement to the Black Butte Contract); vol. 34, exh. 719 (1982 Amendments and Procedures Agreement to the Big Horn Contract).

The 1982 Amendments revised the force majeure provisions of both contracts by setting out in greater detail the circumstances that would modify the parties' obligations under the contracts. Section 11.02 of the amended contracts defines "an event

of force majeure," while section 11.03 describes the scope of the parties' obligations to minimize the effect of such an event. Record, vol. 32, exh. 5, at 26–28; vol. 34, exh. 719, at 10–12. Section 11.01 limits the use of the force majeure provisions according to the type of event and its duration. Record, vol. 32, exh. 5, at 20–26; vol. 34, exh. 719, at 4–10. Both the Black Butte Contract and the Big Horn Contract continued to provide that the contracts would be governed and construed according to Nebraska law.

A. *Edison's Exercise of Section 3.01*

When Edison entered the Black Butte Contract, it operated nine coal-fired generating stations. Four of these stations utilized cyclone furnaces and the other five stations used pulverized coal (PC) furnaces. Cyclone and PC furnaces remove noncombustible coal (ash) by different methods; thus each type of furnace must burn coal with characteristics appropriate to the method of ash removal.[3] Low-sulphur western coal tends to be more suitable for PC furnaces but may be burned in cyclone furnaces that have been properly modified. Since Edison began receiving Black Butte coal, it has successfully used Black Butte coal in its PC furnaces at full load. Record, vol. 17, at 210–13. However, Edison incurred problems when it decided to use Black Butte coal in its cyclone furnaces at Powerton.

When Edison executed the Black Butte Contract in 1976, it planned to continue burning high-sulphur Illinois Basin coal at Powerton under an environmental "compliance plan" filed with the Illinois Environmental Protection Agency ("IEPA"). Record, vol. 20, at 27–29. However, the 1977 Amendments to Clean Air Act, 42 U.S.C. §§ 7401–7626 (1982), brought Edison's compliance plan into conflict with the federal requirements by mandating full conformity with federal sulphur dioxide

---

**3.** Cyclone furnaces melt the ash and allow the molten residue to flow out a slag valve in the bottom of the furnace. If a cyclone furnace does not burn a coal with a sufficiently low melting point and a proper viscosity, the molten ash will harden before it can flow out of the furnace and plug the slag valves. A PC furnace, on the other hand, functions best using a coal with a high melting point. In a PC furnace, the ash remains dry (solid). The dry ash circulates and falls into a slag tank where it is quenched by water and removed from the furnace.

emission standards by July 1, 1979. Therefore, by the time the Black Butte mine opened in 1979, Edison had decided to use low-sulphur Black Butte coal at its Powerton station in order to bring Powerton within the federal emission standards. Record, vol. 20, at 29–30; vol. 23, at 205; Opening Brief of Appellant at 15.

The Powerton cyclone furnaces were not designed to burn low-sulphur western coal and, from the beginning, Edison experienced problems with the high viscosity of the molten ash from Black Butte coal.[4] Even so, Edison was gaining experience in using low-sulphur coals and successfully test-burned Black Butte coal from Area D.[5] Furthermore, in late 1980, during repairs of equipment and buildings damaged in the station's coal dust explosion, Powerton's cyclone furnaces were structurally modified to facilitate burning Black Butte coal. Record, vol. 20, at 48–49; vol. 23, at 213–19.

During the repair of Powerton, Black Butte began mining in Area J. When Powerton reopened in early 1981, Edison began shipping a blend of coal from areas D and J (DJ) to Powerton. Although the Area D coal had functioned in cyclone furnaces, the Area J coal was ill-suited for use in cyclone furnaces. Record, vol. 26, at 193–94. Black Butte advised Edison that Area J coal was unsuitable for cyclone furnaces and recommended that DJ coal be shipped to PC furnaces and that coal similar to Area D coal,[6] but from other areas of the mine or other mines, be shipped to Powerton. Record, vol. 26, at 188–89; vol. 18, at 189–92. Edison's response to Black Butte's recommendation was that Black Butte should make sure the coal met specifications and that Edison would "decide where to send the coal." Record, vol. 18, at 192.[7] Despite these warnings, Edison shipped DJ coal to Powerton in April 1981. Record, vol. 23, at 226–27. When the DJ coal was burned, it immediately "plugged up" all forty Powerton furnaces when slag blocked the furnace valves. *Id.* at 225. Because of this incident, Edison decided in April 1981 to discontinue using Black Butte coal as a regular fuel at Powerton. Record, vol. 16, at 165, 170; *see also* Opening Brief of Appellant at 9; Opening Brief of Appellees at 15. Consequently, Edison was left with large stockpiles of Black Butte coal at Powerton. From April 1981, Powerton burned predominantly other western coals, apparently without the occurrence of any major slagging problems.

In July 1982, the United States District Court for the Northern District of Illinois entered a seventy-page Judgment Order enforcing an IEPA compliance action against Edison. According to the Judgment Order—entered into by stipulation of the parties—Edison would have to successfully conduct a mandatory compliance "stack test" using its "worst case coal" before its Powerton license, due to expire in 1983, could be renewed. Record, vol. 32, exh. 113, app. A; vol. 28, at 110–13; vol. 25, at 158–59. Although Edison did not then use Black Butte coal at Powerton as a regular fuel, it did have stockpiles of Black Butte coal at the station. Thus, unless Edison removed the stockpiles, the "worst case" coal would be the Black Butte coal. Apparently unwilling to remove the stock-

---

**4.** The 1982 Amendments included quality specifications for coal composition, heating value and ash fusion temperatures, but did not contain specifications for the viscosity of the molten ash. Record, vol. 32, exh. 5, at 7–8.

**5.** Coal mining does not always yield a uniform product. Mining will frequently follow one geological seam of coal (area) and then start in another area. The Black Butte mine had at least fourteen different areas that were identified by letter designations from A to N. The coal from different areas was not identical and frequently had different composition.

**6.** Testimony at trial revealed that about half of the coal at Black Butte had characteristics similar to Area D, record, vol. 15, at 124, and was suitable for cyclone furnaces. Record, vol. 26, at 153–54; vol. 17, at 151–57; vol. 25, at 106–08, 198.

**7.** "Edison never contended that the Black Butte coal ... failed to meet the specifications in the 1982 Amendments." Opening Brief of Appellant at 35–36; *see supra* note 4; record, vol. 29, at 50. Thus, whether Black Butte coal met the contract specifications is not an issue presented on appeal.

piles, Edison decided to try a stack test with the Black Butte coal.

Edison had been operating under an IEPA permit which required Powerton to reduce its generating load whenever Black Butte coal was used. Record, vol. 24, at 33–34. Before undertaking the mandatory compliance test, Edison unsuccessfully attempted two optional stack tests in an effort to remove the Black Butte coal generating load restrictions. The first attempt was aborted after the furnace workers had difficulty feeding coal into the furnace and the boiler's automatic trip caused the boiler to shut down. *Id.* at 43–45. The second attempt was aborted when severe slagging problems occurred in thirteen of the seventeen furnaces fed Black Butte coal during the test. *Id.* at 51–53, 146–48. Thus, according to Edison, Powerton was unable to lift its generating load restrictions; and the demonstrated inability to even finish a stack test burning Black Butte coal—Edison's "worst case coal", *Id.* at 33—meant that Powerton could not meet the mandatory stack test requirement for its operating permit.[8] Opening Brief of Appellant at 19–20.

Consequently, Edison asked the IEPA for permission to conduct the mandatory compliance stack test at Powerton with a mixture of the western coals and to operate the station without power load restrictions. The IEPA granted the request but imposed several conditions, including the requirements that Edison burn off all identifiable Black Butte coal as soon as possible and that Edison agree to receive "no more Black Butte coal" at the station. Record, vol. 32, exh. 177; vol. 24, at 72. Operating Powerton at a reduced load, Edison burned off the remaining Black Butte coal in a mixture with other western coal. Then, in November 1982, Edison successfully conducted the stack tests with the other low-sulphur western coals and received an operating permit for Powerton. Record, vol. 25, at 131–33.

On December 16, 1983, Edison notified Black Butte that it was exercising section 3.01 to reduce its scheduled minimum purchase obligations beginning in 1989. Record, vol. 32, exh. 3. Those reductions amounted to 1.5 million tons of coal per year for a ten-year period. Brief of Appellees at 1. In response, Black Butte filed this lawsuit challenging Edison's right to invoke section 3.01.[9]

### B. *Joliet and Waukegan Force Majeure Claims*

Edison claimed the right to invoke the force majeure provisions of the Black Butte and Big Horn Contracts on two occasions. In November 1982, Edison claimed a force majeure event under the Black Butte Contract when a conveyor broke down at Edison's generating station in Joliet, Illinois. In May 1983, Edison claimed a force majeure event under the Big Horn Contract after an I-beam failure closed Edison's generating station in Waukegan, Illinois.

Edison's Joliet station has generating units located on both the south and north side of the Des Plaines River. A coal receiving facility on the south side of the river serves the entire station. Coal is shipped by rail to the receiving facility where special equipment flips the entire railcar, spilling the coal into a large hopper. The coal is then carried by large conveyor belts to storage stockpiles on either the south side or the north side of the river. In November 1982, after twenty years of

---

**8.** As predicted, Edison's sulphur dioxide emissions fell to acceptable levels when low-sulphur western coals were burned. Record, vol. 17, at 164–66; vol. 29, at 203. Although particulate emissions increased when cyclone furnaces became plugged with slag, the record reveals that environmental limitations were never exceeded during the test. Record, vol. 17, at 194; vol. 25, at 129–31.

**9.** Edison has asserted that the use of Black Butte coal raises similar issues with respect to the other Edison generating stations using cyclone furnaces, record, vol. 2, at 495, although evidence at trial was limited to the factual situation at Powerton. Record, vol. 9, at 60–61. Meanwhile, Edison continues to burn Black Butte coal at its generating stations having PC furnaces. These PC units, representing about half of Edison's coal-fired generating capacity, record, vol. 19 at 67–68, have used Black Butte coal successfully at full loads. Record, vol. 17, at 210–13, 214.

uninterrupted service, a conveyor belt spanning the Des Plaines River failed. Edison claimed the conveyor failure (Joliet Conveyor Failure) was a force majeure event and, as such, deferred the purchase of 1,900 tons and terminated the purchase of 18,100 tons of Black Butte coal. For sixteen days, the Joliet station did not receive Black Butte coal destined for generating units on the north side of the river because the coal could not be carried over the Des Plaines River. Record, vol. 22, at 531–40, 562.

In May 1983, a steel I-beam collapsed at Edison's Waukegan station, causing extensive boiler damage and placing the station out of service until early September 1983 (Waukegan I–Beam Failure). Record, vol. 23, at 77–78. Approximately one and one-half years earlier, in November 1981, Edison discovered that hot gas escaping from a tube was weakening the beams and, upon the recommendations of a consulting firm, undertook repairs to stop the leaking gas. Record, vol. 13, at 88–96, 123; vol. 20, at 184–89. In November 1982, an Edison engineer recommended that the furnace area be redesigned and the beams be replaced. Record, vol. 32, exh. 45. When the I-beam collapsed approximately six months later, Edison claimed a force majeure event under the Big Horn Contract, deferring purchase of 13,903 tons and terminating purchase of 4,811 tons of Big Horn coal. Record, vol. 22, at 662–63, 666.

In the district court, Black Butte and Big Horn each challenged Edison's use of the force majeure provision under its respective contract.

## II. PROCEEDINGS

The Black Butte and Big Horn complaints each sought declaratory relief and damages with respect to Edison's exercise of section 3.01. In addition, Black Butte sought declaratory relief and damages as to the claim of force majeure at Joliet. Big Horn sought similar relief against the claim of force majeure at Waukegan. The cases were consolidated for discovery and trial.

. After hearing evidence for twenty days, the jury returned special verdicts, making the following findings:

(1) The conditions necessary for Edison's right to exercise section 3.01 of the Black Butte Contract did not exist.

(2) The Joliet conveyor breakdown was an event of force majeure under the Black Butte Contract, but it was an event affecting the transportation of coal that did not last more than twenty-nine days. Edison did use all good faith efforts to minimize the effect of the event of force majeure and scheduled its work in a manner that would most effectively contribute toward the elimination or minimization of the effect of the conveyor outage. Black Butte was not entitled to damages.

(3) The Waukegan I-beam failure was not an event of force majeure under the Big Horn Contract and Big Horn was entitled to $492,868 in damages.

*See* record, vol. 4, at 1117–1121.

Based on the jury's findings, the district court entered a Judgment providing relief to both Coal Companies. In its Judgment, the court stated that Edison had no right to reduce its minimum annual purchase obligations of Black Butte coal under section 3.01 and ordered Edison to purchase a minimum annual quantity of 5,970,000 tons of coal from Black Butte for the decade 1989–1998. *Id.* at 1188. In addition, although the jury found no damages due Black Butte because of the Joliet force majeure, the court declared that "18,100 tons of coal purportedly terminated by Edison [are] deferred coal under Section 11.01 of the Contract," *id.* at 1189, and imposed a future obligation on Edison to purchase that coal from Black Butte. These two forms of declaratory relief to Black Butte have been valued at about $500 million. Opening Brief of Appellant at 2. The Judgment also directed Edison to pay Big Horn $492,868 in damages since the Waukegan I-beam failure was not a force majeure. Record, vol. 4, at 1189.

Edison filed a timely notice of appeal from these portions of the Judgment; and the parties presented their briefs and oral

argument to this court. Subsequent to oral argument, the parties entered into a Stipulation for Partial Dismissal of Appeal in which they agreed to dismiss the force majeure claims arising from the Joliet and Waukegan incidents and the claim of error in entering judgment requiring Edison to purchase the coal purportedly terminated in the Joliet incident.[10]

## III. ISSUES ON APPEAL

Because the parties have stipulated to dismiss the force majeure claims, we address only the issues and claims concerning section 3.01. On appeal, Edison first argues that section 3.01 gives it the option to significantly reduce its scheduled purchases of Black Butte coal because Powerton was unable to use the Black Butte coal for environmental reasons.

Edison argues that certain doctrines of contract interpretation were inappropriately introduced into evidence during trial and then incorporated into certain jury instructions. As a result, Edison claims the jury was allowed to add terms to the contract language negotiated by the parties and to reallocate business risks contrary to the express agreement of the parties. Edison maintains primarily that (1) the term "good faith" was used in interpreting section 3.01 without adequate definition or a proper legal basis; (2) the doctrine of fitness for purpose and suitability of goods obscured Edison's defense regarding section 3.01; and (3) the theory of commercial impracticability was improperly applied to section 3.01. In addition, Edison asserts that evidence relating to its oversupply situation was irrelevant and that the pervasive influence of that improperly admitted evidence tainted the entire proceedings, denying Edison a fair opportunity to present its defense regarding section 3.01.

### A. Admission of Evidence

Trial judges are granted great discretion in supervising the fact-finding process, and their decisions to admit or exclude evidence

"will not be reversed by this court absent a clear abuse of discretion." *Weir v. Federal Ins. Co.*, 811 F.2d 1387, 1396 (10th Cir. 1987); *see also Hill v. Bache Halsey Stuart Shields, Inc.*, 790 F.2d 817, 825 (10th Cir.1986); *Bennett v. Longacre*, 774 F.2d 1024, 1027 (10th Cir.1985). Moreover, "if no timely objection or motion to strike is made at the time the evidence is admitted, we will reverse only if there was plain error and a substantial right of the objecting party is affected." *Bannister v. Town of Noble*, 812 F.2d 1265, 1271 (10th Cir. 1987).

### 1. Admission of Oversupply Evidence

The Coal Companies allege that Edison had no right to invoke section 3.01 to reduce the supply of coal because there were no environmental reasons for doing so. The Coal Companies' theory of the case was that Edison invoked section 3.01 merely as a pretext to avoid a large oversupply of coal.

At trial, the Coal Companies sought to introduce evidence revealing Edison's oversupply to demonstrate that Edison had no environmental reasons for reducing the coal supply and that Edison was attempting to avoid the receipt of coal in bad faith. When the Coal Companies offered their oversupply evidence, Edison objected, claiming the evidence was irrelevant and that it would improperly put the doctrine of good faith before the jury. The trial judge found the evidence to be relevant and denied Edison's objection.

In order to resolve whether the oversupply evidence was correctly admitted, we turn our attention to the concept of relevancy. Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See also Hill*, 790 F.2d at 826. Thus, the oversupply evidence is relevant if it tends to establish a proposi-

---

**10.** Pursuant to the Stipulation for Partial Dismissal of Appeal, the parties also agreed that paragraphs 2 through 6 of the Judgment be "vacated and that the issues and claims determined in those portions of the Judgment be dismissed."

tion to be proved in the case. The difficulty in this case is that the parties disagree about what proposition is to be proved. The Coal Companies claim that the proposition to be proved is whether there are environmental reasons for invoking section 3.01. In addition, the Coal Companies assert that section 3.01 is subject to an implied covenant of good faith and that a supplemental proposition to be proved is whether Edison's assertions of environmental reasons are the genuine reasons for Edison's invocation of section 3.01. The Coal Companies thus claim that the introduction of oversupply evidence is relevant because it tends to establish a fact of consequence—that Edison acted in bad faith when it invoked section 3.01.

Edison contends that the Coal Companies' view of the proposition to be proved is too broad. Edison argues that contract provisions are subject to good faith requirements only when one of the parties has discretionary power to exercise the provision. Edison claims that the doctrine of good faith should not be before the court because the parties have expressly defined the criteria for invoking section 3.01 as environmental reasons and have left no good faith discretion to Edison.

Answering the question of whether the oversupply evidence was relevant to the resolution of this case (and properly admitted) requires us first to determine whether the concept of good faith is relevant. More specifically, we must determine whether the concept of good faith creates a justiciable issue when the particular contract pro-

vision expressly defines when Edison may invoke the provision to reduce the coal supply.

▮▮▮ The purpose of the good faith doctrine in contract law is to protect the reasonable expectations of the parties by "implying terms in the agreement." Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code,* 30 U.Chi.Rev. 666, 670 (1963). A covenant to act in good faith is generally applicable to all contract provisions and is routinely implied when a particular contract provision is left open so as to allow one of the parties to invoke the provision at his discretion. A discretionary provision that ordinarily has good faith concepts applied to aid in its interpretation is a satisfaction provision. *See, e.g., Neumiller Farms, Inc. v. Cornett,* 368 So.2d 272 (Ala.1979) (buyer's claim that potatoes did not "chip" to his satisfaction is subject to good faith limitations).[11] In such cases, the parties reasonably expect that the buyer will reject the goods only if he is truly dissatisfied with the quality and not for some ulterior reason. In such cases, courts have examined motive evidence when deciding whether the provision was invoked within the implied good faith expectations of the parties.

Although good faith is generally applicable to all contract provisions,[12] "it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant."

---

**11.** Obligations arising under output and requirements contracts are also routinely subjected to good faith limitations because the buyer and seller have "some discretion" to determine their requirements and outputs. E. Farnsworth, *Contracts,* § 7.17, at 528 (1982); *see Kansas Power & Light Co. v. Burlington Northern R.R. Co.,* 740 F.2d 780, 789 (10th Cir.1984), *cert. dismissed,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 308 (1985) ("courts will imply a promise that the buyer's requirements be in good faith"); *Southwest Natural Gas Co. v. Oklahoma Portland Cement Co.,* 102 F.2d 630, 632–33 (10th Cir.1939) ("Requirement contract imposes upon the buyer the obligation to act in good faith"); *see also Lambert Corp. v. Evans,* 575 F.2d 132, 137–38 (7th Cir.1978) (provision that buyer agreed to "pay as used" for seller's inventory did not re-

quire buyer to use all the inventory, but it did imply an obligation of good faith to use inventory amounts dictated by "business judgment" and not merely "to avoid contractual obligations"); *HML Corp. v. General Foods Corp.,* 365 F.2d 77, 81 (3d Cir.1966) ("buyer in a requirements contract is required merely to exercise good faith in determining his requirements").

**12.** The Uniform Commercial Code (UCC) and Nebraska law provide that "every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." U.C.C. § 1–203; Neb.Rev.Stat. § 1–203 (Supp. 1988); *see Yankton Production Credit Ass'n v. Larsen,* 219 Neb. 610, 365 N.W.2d 430, 434 (1985).

*Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C.Cir.1984) (quoting *MacDougald Construction Co. v. State Highway Department*, 125 Ga.App. 591, 594, 188 S.E. 2d 405, 407 (1972)). This kind of provision occurs, for example, when either party is given an unconditional power to terminate the contract or reduce the supply by merely giving written notice within a specified time. *See, e.g., Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 135–39 (5th Cir.) (either party could terminate contract "at any time 'with or without cause' on ten days' notice to the other party"), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). In such a case the reason for invoking the provision is irrelevant. The reason may be purely a whim or caprice; all that matters is that proper notice is given. The rationale behind these cases is that the parties expressly contracted for the unconditional right and thus they cannot reasonably expect any special implied protection from terminating the contract other than the proper written notice.

 The present case does not fit neatly into either of the above categories. Section 3.01 expressly grants Edison the power to reduce the quantity of coal supplied, but it cannot be said to confer an unfettered power that can be used at any time with or without cause. The "mere recitation of an express power" does not in itself preclude the implication of good faith requirements. *Tymshare*, 727 F.2d at 1153. "[T]o say that every expressly conferred contractual power" removes all the parties' unexpressed—but reasonable—expectations, would virtually "read the doctrine of good faith (or of implied contractual obligations and limitations) out of existence." *Id.* at 1154. We are convinced that an express

power will preclude the requirements of good faith if the power leaves absolute and uncontrolled discretion to exercise the power in one of the parties and if the other party can have no reasonable expectation of any implied protection from the power's exercise other than procedural notice.[13]

In *Brown v. AVEMCO Investment Corp.*, 603 F.2d 1367 (9th Cir.1979), a case conceptually similar to this one, the Ninth Circuit ruled that an express condition does not remove all expectations that exercise of the option may be limited by good faith concerns. In *AVEMCO*, a security agreement provided that if the debtor leased an airplane pledged as collateral without consent of the creditor, the creditor could, at its option, accelerate the payment of the loan. *Id.* at 1375. Without the creditor's consent, the debtor leased the airplane to plaintiffs with an option to purchase once the mortgage was paid. After two years, plaintiffs offered full payment of the debt to the creditor. The creditor rejected the offer and accelerated payment, claiming the security agreement had been breached because the lease had been made without its consent. The creditor subsequently repossessed the airplane and sold it for more than the remaining debt. Plaintiffs sued the creditor for conversion, claiming the creditor had not invoked the acceleration provision in good faith to protect its security interest but merely to obtain the airplane for resale at a higher financial gain. When the district court instructed the jury whether the acceleration provision could be invoked without a good faith limitation, it stated that the provision could be exercised "if the jury merely found the technical breach of the lease without consent." *Id.* at 1375–76. On appeal, the Ninth Circuit

---

**13.** A prime example of an express power that was subject to good faith requirements because it was not completely unfettered is found in *Tymshare*. In *Tymshare*, an employee's compensation contract contained an express power that allowed Tymshare to change the term of a sales quota plan "within [its] sole discretion." *Tymshare*, 727 F.2d at 1154. The Court of Appeals for the District of Columbia found this power to be "not necessarily the equivalent" of a power that could be exercised "for any reason whatsoever, no matter how arbitrary or unrea-

sonable." *Id.* Rather, the court found the power subject to good faith limitations because the employee would reasonably expect Tymshare not to "abuse its discretion" in changing the quota plan. Other cases have also placed "good faith" limitations on express powers. *See, e.g., Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251, 1255–58 (1977) (good faith limitations apply to express power to terminate contract "at will"); *Davidson Hardware Co. v. Delker Brothers Buggy Co.*, 170 N.C. 298, 300, 86 S.E. 958, 959 (1915).

ruled that this instruction was "erroneous and prejudicial" because the exercise of the contract provision was also subject to implied limitations of good faith. *Id.* at 1376.

The Ninth Circuit ruled that even though the provision could be exercised only if a certain event occurred, the provision was not automatically triggered on the occurrence of the condition. Rather, exercise of the provision remained within the creditor's discretion. The court held that this discretion was itself limited and could be exercised only in good faith because the debtor would have reasonable expectations that the provision would be exercised only if the creditor honestly believed his payment was impaired. *Id.* at 1378.

■■■ Like the creditor in *AVEMCO*, Edison has discretion to exercise the coal reduction provision if the technical requirements of the express condition are met.[14] We are convinced that this discretion must be exercised in good faith if the Coal Companies have any reasonable expectation that would impliedly limit the circumstances in which Edison could invoke section 3.01.[15] Moreover, although the express condition in this matter is written to reflect more precisely the expectations of the parties than was the *AVEMCO* condition, we are not convinced that the mere fulfillment of the condition relieves Edison of the obligation to act in good faith.

We are satisfied from our review of the record that the Coal Companies have a reasonable expectation that Edison will neither deliberately cause the environmental problems so as to satisfy the condition's requirements nor cite environmental reasons for invoking section 3.01 unless such difficulties in fact justify a reduction in the amount of coal to be supplied. Two elements support our conclusion. First, Edison can exercise the section 3.01 power only if some triggering event occurs. When the event triggering the right to invoke the express power is closely controlled by one party, the district court may examine the good faith of the party to determine whether the party inappropriately caused or prevented the triggering event. *See R.A. Weaver and Associates, Inc. v. Haas and Haynie Corp.,* 663 F.2d 168, 176 (D.C. Cir.1980). In this case it was proper for the district court to inquire whether Edison acted with commercial reasonableness and honesty in fact when it burned Black Butte coal. Such an inquiry would allow the court to determine wheth-

**14.** Section 3.01 provides that if the environmental reasons cause problems with the permit or variance, Edison *"may ... reduce the minimum"* supply of coal. Record, vol. 32, exh. 4, at 3 (emphasis added).

**15.** Section 1–203 of the Uniform Commercial Code imposes an obligation of good faith in the performance and enforcement of every contract duty within the UCC. Moreover, section 1–208 of the UCC expressly deems certain language in options to accelerate at will to be subject to good faith obligations. The rationale behind section 1–208 is to protect the debtor from the unexpected acceleration of the contract payment due to the uncontrolled will of the creditor. *See AVEMCO,* 603 F.2d at 1378–79.

In *AVEMCO*, the Ninth Circuit noted that its case did not involve a section 1–208 situation because the exercise of the option was not at the creditor's uncontrolled will but rather at the creditor's discretion once the debtor leased the airplane without creditor consent. Despite this distinction, the court found the section 1–208 rationale applicable so as to protect against the unexpected invocation of the option. The court reasoned that the acceleration provision could be invoked only in good faith because the debtor in a security agreement expects, even though

there is an express provision concerning consent, that the provision will be exercised only as a "shield against security impairments" and not as a sword in the creditor's hand "for commercial gain." *Id.* at 1379.

In the present matter, the language of section 3.01 is not deemed to be subject to good faith limitations under section 1–208 nor is it subject to the heightened expectations and protection given acceleration clauses in *AVEMCO*. Nevertheless, the present matter does not escape the equitable analysis that flows from section 1–203, section 1–208, and *AVEMCO*. In other words, where a contract provision is exercisable only at some discretion of one of the parties, and expectations are created by the contract, good faith limitations are applicable to protect the non-exercising party from unexpected invocation of the option. We are satisfied in the present matter that the parties expected section 3.01 to be used as a shield against the possibility that Black Butte coal would be environmentally unusable, and not as a sword in Edison's hands to avoid financial losses if Edison found it beneficial to defer coal purchases due to operational or supply concerns.

er Edison improperly burned the coal so as to cause environmental problems in an effort to reduce its obligation to purchase coal. Therefore, oversupply evidence produced to establish whether Edison acted reasonably and honestly was properly admissible to test this proposition.

Second, the Coal Companies have the reasonable expectation that Edison's assertions are in honesty *a* reason for Edison's invocation of section 3.01. Edison cites *Zullo v. Smith,* 179 Conn. 596, 427 A.2d 409 (1980), and *Loma Linda University v. District–Realty Title Ins. Corp.,* 443 F.2d 773 (D.C. Cir.1971), to support its argument that good faith evidence may not be admitted to show the "real reason" why Edison invoked section 3.01. These cases do not stand for this proposition. Nor do they forbid the admission of evidence regarding the motive a party has for exercising the express power. Rather, they hold that if a party has multiple reasons for invoking the power, invalid reasons do not void the exercise of the power as long as one of the remaining reasons is valid under the contract.

In the present matter the district court had to determine whether Edison had a valid reason for exercising section 3.01. Section 3.01 provides that a valid reason would exist if there were some adverse effect on a permit or variance due to environmental reasons. The problem in this case is that the term "environmental reasons" is not defined by the parties nor by convention in the electric power industry. The district court found the term to be ambiguous and neither party disagreed. *See* record, vol. 4, at 1046; vol. 29, at 42–48. Because the term is ambiguous, it is impossible to determine with certainty whether the parties expected that section 3.01 would be exercised only when regulations of the Environmental Protection Agency were violated or whether some

more distant causation would be allowed. Because of this uncertainty, it is impossible to tell objectively if the express condition was met, unlike in the case where the express condition requires only a written notice within a certain time. Because "environmental reasons" is not defined, the term may be viewed as a motivational term—i.e., that section 3.01 can be invoked *for* environmental reasons. Viewing the term from this perspective, we conclude that it was appropriate for the district court to allow extrinsic evidence which tended to prove that Edison's motive for exercising section 3.01 had nothing to do with environmental concerns. The Coal Companies were properly permitted to produce evidence of Edison's "real reason" for exercising its power, and the jury was properly allowed to determine if Edison had *a* valid reason for invoking section 3.01. We cannot say the trial court abused its discretion in allowing the Coal Companies to present oversupply [16] and other good faith evidence.[17]

### 2. Admission of Expert Testimony

■ On appeal, Edison claims that Mr. Robert Sansom, an expert witness for Black Butte, was unqualified to interpret the meaning of section 3.01 and that the admission of his opinion on whether the Powerton furnace problems were "operational" or "environmental" violated Rule 703 of the Federal Rules of Evidence.

We note that Mr. Sansom repeatedly testified that his review of the Powerton experience revealed only operational problems, not environmental problems, in burning Black Butte coal. Record, vol. 17, at 160–62, 166–69, 182, 194, 202, 210. Not once during Mr. Sansom's testimony did Edison object to this testimony. Nor was the admission of Mr. Sansom's testimony plain

---

**16.** On appeal the Coal Companies also claim they introduced the supply evidence to attack the credibility of Edison's witnesses. Because we conclude that the oversupply evidence was properly admitted as relevant evidence to the issues in the case, we do not reach the credibility justification.

**17.** Edison also claimed error in the district court's admission of impact evidence—i.e., Edison's ability to burn Black Butte coal at other stations and Edison's intention in 1976 not to use Black Butte coal at Powerton. For the reason set forth in this section, we find no abuse of discretion in admitting this evidence.

error.[18] We therefore conclude that Edison forfeited its right to challenge the admission of this evidence on appeal. *See Bannister v. Town of Noble*, 812 F.2d 1265, 1271 (10th Cir.1987).

### B. *Jury Instructions*

When examining a challenge to jury instructions, we review the record as a whole to determine whether the instructions "state the law which governs and provided the jury with an ample understanding of the issues and the standards applicable." *Ramsey v. Culpepper*, 738 F.2d 1092, 1098 (10th Cir.1984). We thus "consider all that the jury heard and, from standpoint of the jury, decide 'not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues.'" *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984) (quoting *Alloy Int'l Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222 (7th Cir.1980)).[19]

### 1. *Jury Instruction No. 16*

■ At the close of trial, the court issued a jury instruction which allowed the jury to consider whether the parties had performed their contractual obligations in good faith with respect to section 3.01:

The law requires that all parties to a contract perform their duties under the contract in good faith. In deciding whether Section 3.01 and the force majeure clause were validly invoked, you may consider whether each of the parties performed their contract duties honestly and in good faith. While the plaintiffs claim that Edison's actions were taken as a mere pretext to escape an unprofitable bargain, Edison claims that Black Butte put it in the position where it faced a loss of its environmental operating permit for its Powerton Station. You may consider any evidence relating to whether or not a party performed its contract obligations in good faith in reaching your verdict.

Record, vol. 4, at 1072.[20]

Edison claims that this instruction has three flaws: (1) it improperly puts the issue of good faith before the jury; (2) it does not adequately define the term "good faith"; and (3) it allows the jury to find Edison's desire to make a profit a sufficient ground for concluding that Edison acted in bad faith.

We have already resolved in Section III(A) that the issue of good faith was proper; thus Edison's first claim of error is not well taken.[21] In its second contention,

**18.** We see no error in allowing Mr. Sansom to testify whether there were any environmental violations which would indicate that Powerton had experienced environmental problems in burning the Black Butte coal. Mr. Sansom's expertise qualified him to discuss and decide whether Powerton had experienced operational problems or environmental problems, or both. There may have been some qualification problems if Mr. Sansom had tried to testify as a legal expert as to whether section 3.01 could thus be invoked, but his testimony never reached that issue. He only testified as to whether the problems were operational or environmental.

**19.** "The appellate standard of review to be applied by the court is clear: an error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Durflinger*, 727 F.2d at 895 (quoting *Wellington v. Daniels*, 717 F.2d 932, 938 (4th Cir.1983)).

**20.** The Coal Companies intimate that Edison waived any objection to this issue during the instruction conference by proposing an alter-

nate version of the third sentence of the instruction. Brief of Appellees at 46 (citing record, vol. 29, at 54–56). We find insufficient support in the record to maintain that Edison did not preserve an objection to instruction 16.

**21.** We also note that Edison was not completely dissatisfied with the good faith instruction at trial. During the instruction conference Edison proposed the third sentence of the instruction. *See generally* record, vol. 29, at 22–25; vol. 4, at 1132. Moreover, Edison used this good faith instruction to promote its theory that the Coal Companies had failed to act in good faith. During closing argument Edison advised the jury that they would receive this instruction and explained that the instruction allowed them to find that Black Butte had acted in bad faith by knowingly misrepresenting the qualities of its coal to Edison. Record, vol. 29, at 204–09. Edison's attorney also argued for the application of the good faith doctrine at the instruction conference. In arguing that a sentence explaining the claimed good faith violations of each party should be included in instruction 16, Edison's attorneys stated "if you're going to enforce

Edison claims that since "good faith" was not defined and because the term was joined with the word "honestly," the jury would think that the term "good faith" means something more than honesty and would "impose its sense of equity on the facts." Opening Brief of Appellant at 28–29. We find no reversible error in the court's failure to define good faith. The record reveals that Edison spent time explaining the meaning of good faith to the jury and how the application of the concept of good faith should affect the outcome. *See, e.g.,* record, vol. 29, at 204–09 (in closing argument Edison's attorney claims that Black Butte's conduct shows an absence of good faith). Although this instruction may not be a model of completeness, we are not convinced that this single omission was sufficient to mislead the jury or prevent it from resolving the issue.

■ Edison's final objection to instruction 16 is that the issue of good faith allows the jury to find that a motive to make a profit demonstrates bad faith. We disagree. This instruction allows the jury to look behind the allegations of both parties to determine why they acted as they did. The instruction merely informs the jury of the parties' theories; it does not tell the jury how it must find. We are satisfied that the use of the word "pretext," combined with the testimony and arguments, made it clear to the jury that even if Edison had financial motives for exercising section 3.01, Edison's invocation of section 3.01 would not have been pretextual as long as Edison also had environmental reasons.

Our review of the instructions and the record reveals that the parties' theories of the case were conveyed to the jury and that the jury was not misled in its duties to determine the issues. We find no reversible error in instruction 16.

### 2. *Jury Instruction No. 15*

Edison also challenges jury instruction 15. The trial court instructed the jury:

the contract against us which is what you're trying to do, good faith still applies. I don't

Where the parties are vendors or buyers on equal footing with respect to the subject matter of the transaction, and one of the parties draws up its own contract specifications with some degree of specificity, and assumes a firm obligation to perform thereunder, and there was no reason for the seller to have known of a particular purpose for the goods and that the buyer was relying on the seller's skill or judgment to furnish appropriate goods and did in fact so rely, that party in contracting for such goods may have assumed the risk of fitness of such goods for its purpose.

In other words, if Edison, as a merchant with a high degree of knowledge regarding coal specifications necessary for the running of its plants, ordered what it wanted, and was provided what it ordered, then you may find that Edison could not properly invoke Section 3.01 merely because it encountered operational, not environmental, problems using Black Butte Coal at its Powerton Station.

Record, vol. 4, at 1071.

Edison claims that this instruction is cause for reversal (1) because it makes the suitability of the coal an issue and (2) because the final phrase "merely because it encountered operational, not environmental problems" takes Edison's theory, that operational problems led to environmental problems, away from the jury. Opening Brief of Appellant at 38–39.

■ With regard to Edison's first claim, considerable evidence was presented at trial about the characteristics of Black Butte coal. Significant portions of the record were devoted to showing that Black Butte coal, at least from area J, did not have the viscosity characteristics to be usable in cyclone furnaces. However, the contract never made the viscosity characteristic a requirement for the coal. In fact, the parties do not dispute that the Black Butte coal met all of the specifications required by the contract. Opening Brief of Appellant at 35–36; *see* record, vol. 29, at 50.

think there is any." *Id.* at 56.

Because the coal specifications were not at issue, Edison cannot reject the coal merely because Edison now finds the coal unsuitable for its use. We conclude that this instruction did not place the suitability of the coal in issue. This instruction correctly states the law that it does *not* matter whether or not the coal is suitable because Edison is a knowledgeable buyer; and as long as Edison received what it ordered, Edison cannot invoke section 3.01 merely for operational problems. There must be some environmental problem.

■ Edison's second claim of error is that the last phrase of instruction 15 takes its theory away from the jury because it indicates to the jury that its "inquiry should end if it finds that Edison 'merely ... encountered operational ... problems.'" Opening Brief of Appellant at 39. The difficulty in interpreting instruction 15 is in the ambiguity of its language. The word "merely" in the disputed phrase appears to modify the verb "encounter" and, therefore, technically permits the reading of the instruction Edison suggests. Nevertheless, we believe that the true import of the instruction is that Edison cannot properly invoke section 3.01 if it has *only* operational problems. Edison must show some environmental problem. This language allows Edison to claim that operational problems can lead to environmental problems and thus the proper exercise of section 3.01. Moreover, this interpretation of instruction 15 is the one Edison's attorneys presented to the jury in closing argument:

> [I]nstruction [15] deals with the question of operating problems. Despite the length of the instruction, really all that it says is that operating problems in burning Black Butte coal can't provide a basis for Section 3.01.

We've never disputed that. We've never taken the position that operating problems in burning Black Butte coal gives us the right to invoke Section 3.01, but the one thing you have to keep in mind is that when the characteristics of the coal that we use leads to operating problems also causes environmental problems, then we're well within the parameters of Section 3.01.

Record, vol. 29, at 147.

Our review of the record does not convince us that the phrasing of instruction 15 prevented Edison from presenting its theory of the case to the jury or otherwise created reversible error.

### 3. Jury Instruction No. 13

Jury instruction 13 provides:

> In deciding whether defendant Edison validly invoked Section 3.01, you may consider whether the parties intended Section 3.01 to apply only in the event that changes in circumstances regarding environmental regulation had a major impact on Edison. You may consider whether the circumstances or conditions relied on by Edison are of a magnitude that would justify invocation of Section 3.01 under what you conclude is the correct interpretation of that section.

Record, vol. 4, at 1069. On appeal, Edison contends that the instruction misled the jury to believe that section 3.01 can be invoked only if there was a major impact on Edison. Reply Brief of Appellant at 19–20. We note, however, that Edison's counsel did not object to instruction 13 at trial.

Rule 51 of the Federal Rules of Civil Procedure requires a party to object to an instruction before the jury retires.[22] In addition, we have previously ruled that the

---

**22.** The version of Rule 51 of the Federal Rules of Civil Procedure which was effective at the time of trial states:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to

the jury, but the court shall instruct the jury after arguments are completed. *No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.* Opportunity shall be given to make the objection out of the hearing of the jury.

(Emphasis added).

"court of appeals will not review the propriety of a jury instruction unless counsel has timely objected to the instruction at trial." *Ryder v. City of Topeka,* 814 F.2d 1412, 1427–28 (10th Cir.1987); *see also Weir v. Federal Insurance Co.,* 811 F.2d 1387, 1390 (10th Cir.1987); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1514–15 (10th Cir.), *aff'd,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). "Only in the event of plain error could objections to instructions warrant reversal where such objections were raised for the first time on appeal." *Ryder,* 814 F.2d at 1428; *see also EEOC v. Prudential Fed. Sav. & Loan Ass'n,* 763 F.2d 1166, 1174 n. 5 (10th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).

■ The district court stated that the parties were deemed to have an objection to the failure of the district court to give in substance an instruction they proposed. Record, vol. 29, at 48–49, 95. Edison submitted an alternate jury instruction that combined what ultimately became jury instructions 13 and 14. Record, vol. 4, at 1126. Although the language of the alternate was given in substance, Edison's alternate version did not address the impact issue and, arguably, Edison could be deemed to have an objection preserved for appeal. However, our review of the record reveals that Edison expressly waived any objection it had to the impact issue. At the instruction conference Edison's counsel not only failed to object to instruction 13 but also expressly stated that the impact issue should be considered by the jury: "[T]he impact is an issue.... It should be in the instruction.... I have no problem with leaving the impact issue in the case." Record, vol. 29, at 41. In light of Edison's statements, appeal of this issue has been waived and is not properly before this court. In addition, we find no plain error created by the instruction. Section 3.01 is ambiguous; thus it was proper for the district court to instruct the jury that it may decide whether the parties intended to resort to section 3.01 only if there was a major impact on Edison.

### 4. *Jury Instruction No. 14*

At trial Edison and the Coal Companies interpreted section 3.01 differently. Black Butte alleged that section 3.01 was similar to an "excuse" provision that could be invoked only if new or changed requirements of the civil or military authority caused Edison to be denied a permit for environmental reasons. Edison, on the other hand, perceived section 3.01 as an option provision that could be invoked to reduce its purchase obligation if Edison could not meet the environmental requirements that were in force at the time the contract was signed or that may be enacted in the future. Because section 3.01 is ambiguous, the district court and the parties agreed that the jury should be allowed to decide whether section 3.01 applied only to "new or changed" requirements or also to then-existing requirements. Record, vol. 29, at 93–94 (Edison's counsel states the "new or changed" issue is a valid one for the jury).

With this purpose in mind, the district court gave instruction 14:

In deciding whether Section 3.01 was validly invoked by defendant Edison, you may consider whether the conditions involving use of Black Butte coal at the Powerton station are new or changed from the conditions which existed at the time the contract was entered into, or from requirements existing on or before May 13, 1976.

Record, vol. 4, at 1070. Edison objected to this instruction because it felt that the instruction implied that section 3.01 contained a "new or changed" requirement and thus the jury was not allowed to decide the issue. Record, vol. 29, at 92–94.

■ The record reveals that Edison proposed an instruction which combined the issues contained in the district court's instructions 13 and 14:

In deciding whether Section 3.01 was validly invoked by defendant Edison, you may consider whether the parties intended Section 3.01 to apply only to new or changed requirements of civil or military authority or also to requirements existing at the time the contract was signed. If you find that the parties intended Sec-

tion 3.01 to apply only to new or changed requirements of civil or military authority and if you also find that Edison's invocation of Section 3.01 is based upon circumstances, such as environmental regulations, that were in existence on or before May 13, 1976, then you may find that those circumstances are not a valid reason for invoking Section 3.01.

Record, vol. 4, at 1126. Edison's position at the instruction conference and on appeal is that its proposed instruction more clearly directs the jury to decide whether only "new or changed" requirements trigger the application of section 3.01. Essentially, Edison argues that the district court should have used its proposal. Indeed, instruction 14 could have been written more clearly to express the factual question being presented to the jury. Nonetheless, the presentation of the instruction "contains substantially the same information" as Edison's proposal and does not constitute reversible error or call for a new trial. *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984). Moreover, when instruction 14 is considered in conjunction with instruction 13 and the closing arguments (record, vol. 29, at 148–50), it becomes evident that the jury was aware that it was to decide whether section 3.01 applied only to "new or changed" requirements. We do not find instruction 14 to be misleading or prejudicial.[23]

In light of our opinion, paragraph 1 of the Judgment of the district court is AFFIRMED; and the district court is directed to vacate paragraphs 2 through 6 of the Judgment as agreed and requested by the parties pursuant to their Stipulation for Partial Dismissal of Appeal.

---

**23.** On appeal, Edison argues that the "new or changed" issue never should have been presented. Considering that Edison submitted a jury instruction presenting this issue and that Edison agreed at the instruction conference that the issue was valid, we find Edison's argument to be disingenuous and rule that the use of the "new or changed" language *cannot now be objected to* on appeal.