**COOK UNITED, INC., Appellant,**

v.

**John W. WAITS et al., Appellees.**

Court of Appeals of Kentucky.

June 28, 1974.

John S. Greenebaum, Boyce F. Martin, Jr., Louisville, for appellant.

Robert H. Rice, Wood, Pedley, Stansbury, Rice & Warner, Louisville, for appellees.

REED, Justice.

The owners of adjacent properties agreed to jointly develop and construct a mall-type commercial shopping center. The precise issue posed to the trial court was whether the appellees were precluded from constructing a tire, battery and automobile accessory store for Goodyear Tire and Rubber Company on a particular site referred to in a writing that purported to integrate the agreements between the parties.

The plaintiff-appellant sought an injunction prohibiting the defendants-appellees from constructing or using the particular site in question for a tire, battery and auto accessory store. This claim was based on the assertion that a proper interpretation of the contract restricted the defendants to use the particular site only for an automobile service station limited to a major oil

company operation. The defendants insisted that use of the site was not so restricted and that the proposed business operation was permissible according to the contract.

The trial judge considered the extensive evidence adduced. He filed detailed findings of fact and succinct conclusions of law. Consistent with his findings and conclusions he adjudged the defendants-appellees not in breach of contract and the requested injunction was denied. The plaintiff thereupon appealed to this court. We perceive no error that would authorize us to set aside the trial judge's decision.

Defendants, John W. Waits and his wife, owned a tract of land located in Jefferson County, Kentucky, containing approximately 33.170 acres. Waits decided to build a shopping center on this land but desired to develop only one-half of the acreage. Plaintiff, Cook United, Inc., became interested in joining the undertaking. In June, 1969, Waits conveyed to Cook 15.-407 acres of the tract and retained 17.763 acres. Waits and Cook agreed that each would separately develop his tract into a common mall-type shopping center to be known as Westland Mall.

At the same time Waits made the conveyance of property to Cook, the parties executed a writing, which purported to represent a final expression of the terms of their agreement. This writing signed by the parties recited that both of them agreed to operate their respective parcels of ground as one integrated mall-type shopping center. A plot plan outlining the proposed development was annexed to the written agreement.

By the terms of the writing, Cook agreed to construct retail store buildings in the general location shown on the annexed plot plan with a set-back line as indicated thereon and Waits agreed to build a mall-type shopping center substantially as shown on the "perimeter outline of the center of the annexed plat."

The provisions of the writing that are especially pertinent to an interpretation of the scope of contractual obligations imposed upon the agreeing parties so far as the current dispute is concerned are:

"(a.) [Cook] will construct retail store buildings on its property in the general location shown on the annexed plot plan and maintain a set-back line for the front of its retail stores no closer to U.S. Highway 31W than shown on the plot plan, except that [Cook] *may* also construct the gasoline station as shown on the plat plan and the building in the southeast corner of [Cook's] property shown on the plot plan . . .

"(b.) [Waits] may not use that portion in the red cross-hatched area for a restaurant or movie theater and agrees that any restaurant or movie theater must be at least 270 feet in distance from [Cook's] north property line. [Waits] *may* construct a bank at the location shown on the annexed plat provided, however, the elevation for such bank shall not exceed sixteen (16) feet above the center line of Dixie Highway. [Waits] *may likewise* build a service station in the area marked off as such on the annexed plat, provided, however, such auto service station shall be limited to a major oil company operation.

"(c.) [Waits] agrees not to use the premises shown on the annexed plat . . . *for a super market or grocery store or for a discount store operation.* Discount store operation is defined as a retail establishment which regularly sells a major portion of its merchandise at off prices or at prices below normal retail, or advertises or holds itself out to the public as a discount house or store as regularly selling off price . . . . ." (emphasis supplied).

Attached to the writing and expressly made a part of it was the drawing or plot plan, which was recorded with the writing. The plan showed proposed uses of some of the sites. Cook's tract was shown containing a discount service station along

Dixie Highway, a site for a possible future building, paved parking area, and the main building—a Consolidated Sales Store. This main building was shown connected by one continuous roof to the main building on Waits' tract, which utilized an appreciable part of Waits' property. Also shown on Waits' parcel in the northeast area was a small portion on which was a notation: "Major Oil Co. Service Station" and a small area on which was the notation: "Bank." Along the westerly side of Waits' tract, there was another notation on the plan: "270 feet—no restaurant or movie." In the lower right-hand corner of the plan there was this statement:

"NOTE

This site plan is tentative and subject to such changes as the Owners, Developers, Architect, Sponsors, or Government authorities may direct, without notice to the tenants."

Both contending parties introduced considerable evidence. Cook's testimony sought to prove that during the negotiations Waits was clearly told that only a service station could be built on the site in controversy. Waits' evidence was that he was told no such thing, but was only advised that he could not build on some sites and those restrictions then were clearly stated in the writing. His proof sought to establish that aside from those mentioned in the writing no other restrictions were mentioned.

It was clearly established that the Goodyear Tire and Rubber Company store was not a discount store as that entity is defined in the writing.

The trial judge found that the language in the writing whereby Waits agreed to build a mall-type shopping center "substantially as shown on the perimeter outline of the center on the annexed plat" had reference to the arcade or large building that was continuous between the two tracts. The architect for the development testified that the terms "perimeter outline of the

mall-type shopping center" in technical language referred not to the "service station" or "bank" but to the large building that connected with the Cook building.

The trial judge also found that the word "may" as used in the expression "Waits may likewise build a service station" carried the meaning of "permission" or "option." The trial judge concluded that the terms of the writing permitted Waits to use the site in a manner not now desired by Cook but not prohibited by the contract.

■ Cook and Waits both point to the writing with its annexed plot plan as the final expression of the terms of their understandings. The trial judge therefore correctly regarded these writings as a completely integrated agreement for the purpose of determining the scope of contractual obligations created. The interpretation of an integrated agreement is directed to the meaning of the terms of the writings in the light of the circumstances. The question of interpretation in these circumstances is to be determined by the trier of fact if it depends on a choice among reasonable inferences to be drawn on the extrinsic evidence admissible apart from the application of the parol evidence rule. Otherwise, the question of interpretation is a question of law. A writing is interpreted as a whole and all writings that are part of the same transaction are interpreted together.

■ When words are used in a context of ordinary usage then their commonly understood meanings are the meanings to be ascribed to those words. When other words, even in the same writing, are used as technical terms in a transaction entered into by parties knowledgable in a technical field then the technical meanings of such words are the meanings to be ascribed to those words. Bradford v. Billington, 299 S..W2d 601 (Ky.1957).

■ The trial judge considered the relevant evidence concerning the situation and relations of the parties and the subject

matter of the principle transaction. He interpreted the words "may" and "likewise may" in the commonly understood meaning of "permission" or "option." He interpreted "perimeter outline" to mean an arcade or large building inclosing stores as the technical meaning given to such words.

The findings of fact were supported by substantial evidence or were admitted as not in dispute. The application of the facts so found to the concededly integrated agreement violated no principle of law. Consequently, we are unauthorized to set aside the trial court's interpretation of the terms of the integrated agreement and the scope of the contractual obligations imposed upon the parties thereby. See Restatement (Second) of the Law of Contracts §§ 227, 235, 236 and 238 (Tent. Draft 1973), and the comments of the Reporter applicable to those sections.

The judgment is affirmed.

All concur.