**KENTUCKY UTILITIES COMPANY,**
Movant/Cross–Respondent,

v.

**SOUTH EAST COAL COMPANY,** Citizens Fidelity Bank & Trust Company, Kentucky Coal Association, Respondents/Cross–Movants.

**Nos. 91–SC–357–DG, 91–SC–609–DG and 91–SC–610–DG.**

Supreme Court of Kentucky.

June 4, 1992.

As Modified on Denial of Rehearing Aug. 25, 1992.

Escum L. Moore, Turley and Moore, Lexington, D. Brian Rattliff, Richard F. Newell, Ogden, Sturgill & Welch, Louisville, Robert J. Turley, Lexington, for Kentucky Utilities Co.

Bert T. Combs, William H. McCann, John Regan Rhorer, Jr., Penny R. Warren, Wyatt, Tarrant & Combs, Lexington, for South East Coal Co.

Hiram Ely, III, Louisville, James A. Kegley, Lexington, J. Mark Grundy, Greenbaum, Doll & McDonald, Louisville, for Citizens Fidelity Bank & Trust Co.

William K. Caylor, Lexington, for Kentucky Coal Ass'n.

## OPINION OF THE COURT

ROBERT L. CHENOWETH, Special Justice.

This Court granted discretionary review in this case to consider several important issues, some of which are of first impression in this state. The path this litigation has taken has been long and arduous. Kentucky Utilities Company ("KU") filed its complaint for declaration of rights and breach of contract against South East Coal Company ("South East") in June 1984. To be considered was the triennial price review provisions of a coal supply contract. More than five years later, after lengthy hearings, a trial by the court without a jury, the consideration of voluminous documents filed of record, and pounds of briefs of counsel, the trial court in March 1989 entered a 119 page opinion and order essentially in favor of the Plaintiff, KU. That opinion and order was modified and enlarged by the trial court in a series of subsequent opinions and orders. The trial court's declaration of rights and judgment was entered in December 1989. Upon appeal to the Court of Appeals, the trial court's decision was affirmed in part, reversed in part and remanded. We, too, now affirm in part, reverse in part and remand.

KU, the Plaintiff in the trial court, is a well known electric utility company in the State and serves several hundred thousand customers in 77 counties. Just under 100%

of its generating capacity is coal-fired. KU operates its generating units as required to meet the demand of its customers, which obviously fluctuates during each day, from day to day and by the season. The generating units must meet emission requirements established by both state and federal laws. KU's newer generating units are so-called "compliance units" which simply means they burn lower sulphur compliance coal rather than being equipped with expensive sulphur dioxide "scrubbers." KU was authorized to build a compliance unit (#3) in 1978 at its plant located at Ghent, Kentucky.

Several years before 1978, South East had begun contracting with KU and other utilities planning to burn compliance coal. South East is a large coal producer and one of the largest independent producers of compliance coal with mines and production operations in southeastern Kentucky. KU was seeking compliance coal because it had decided in the mid-70's it could save approximately $34 million a year by using compliance coal rather than installing expensive scrubbers and burning high-sulphur coal. KU's construction permit for building Unit #3 at Ghent required a long-term contract for compliance coal to be in place by July 1, 1978. That unit was to become operational in 1981.

In early 1978, KU reviewed bid proposals for a long-term compliance coal contract. South East's bid was the lowest delivered cost from a single, domestic origin supplier. The terms of the coal supply agreement between KU and South East were heavily negotiated and the agreement was signed effective July 1, 1978. The term of the agreement was for 12 and ½ years, through December 31, 1990. (Section 3.01.) The quantity of coal to be supplied under the agreement was established for initial deliveries of 140,000 tons annually and thereafter increasing to a nominal one million tons in 1982 (the first full calendar year of Unit #3 operation). (Section 3.02.) The initial base price for the compliance coal was set at $43.76 per ton with $38.00 of that amount being for the coal components (labor, materials, supplies, royalties, fixed costs and the severance tax) and the

balance being for transportation components. The coal was to be delivered by barge at the unloading facility of KU located at its generating facility at Ghent. South East had obtained a considerable reserve of leases and had made a substantial investment of its resources so as to be in a position to provide an adequate, stable and long-term supply of compliance coal to KU.

The negotiated coal agreement contained extensive provisions for periodic upward or downward adjustment of the price components. (Sections 4.03–4.09). Some of the adjustment provisions were to correlate to South East's cost changes while others were specifically keyed to published indices.

The agreement also contained detailed provisions for a triennial review of not only the base price, but also of the price component adjustment provisions. (Sections 12.-01(1)–(2).) Such a review was available to be initiated by KU or South East one year before each third anniversary. The parties agreed to address revising the base price and/or the price component adjustment provisions premised primarily on the occurrence "of material unforeseen events or changed conditions" which caused the price of the coal to be inequitable to one of the parties to the agreement.

Not long into the agreement, with South East making deliveries of the coal, KU rejected some of the deliveries under the force majeure provisions of the coal agreement (Section 11). Between March 1982 and January 1988, KU declared 28 force majeure events and eight such events had been declared prior to this period.

While neither of the parties exercised their right of review at the first triennial opportunity, KU, in 1983, initiated review of both the price and adjustment provisions of the coal agreement. There had been by that time a number of adjustments to the price components such that the base price for the coal had reached nearly $57.00 per ton. The parties could not agree on the application of the review provisions of the agreement (Section 12.01). KU filed its declaration of rights action against South

East in late June 1984, seeking, *inter alia,* a $19.00 per ton reduction in the price of the compliance coal. Early in the litigation KU filed a motion pursuant to CR 67.01 for leave to deposit the $19.00 per ton disputed portion of the billing price in court. After a hearing lasting eight days, the trial court issued an extensive order in April 1985 allowing KU to deposit $10.00, subsequently increased to $11.30, per ton in court.

Early in 1986 various banks (appellees herein) intervened in KU's lawsuit against South East and sought judgment in their favor as to the deposited funds based upon the argument these funds were proceeds subject to the banks' security interest from loans made to South East. The trial court denied the relief requested by the banks. Moreover, in June 1986, KU initiated a second review under the triennial review provisions of the coal supply agreement with South East and without any agreement between the parties being reached, KU was permitted by the trial court to file a supplemental complaint incorporating the second review into the litigation.

In 1988, after the parties had proceeded with two years of discovery, the trial court conducted a non-jury trial lasting 26 days. On March 9, 1989, the trial court, in an exhaustive 119 page Opinion and Order, set out its findings of fact and conclusions of law. The trial court determined the 1978 coal supply agreement was a contract for the sale of goods and consequently, that KRS 355.2–107(1) and Article 2 of the Uniform Commercial Code (UCC) applied. The trial court nonetheless specifically noted that the law of contracts still applied to sales contracts in all areas in which the UCC has not displaced it.

The trial court found that in 1973 an oil embargo had created a panic in the United States. The trial court recognized by 1978, when the coal supply agreement was entered into, that the prospects for a healthy coal industry for the next decade had appeared very good. The trial court noted that the federal government, economists and experts had all been of a similar opinion that there would be an increase in the cost of oil and as well, the cost of all other types of energy. It had been anticipated the demand for coal would be strong and with that elevated demand would have come a dramatic escalation in the price of coal. The trial court stated that most experts believed inflation was to have continued at a strong pace. Further found by the trial court was that there had been expected real growth in energy usage without significant conservation efforts. It had been expected that domestic oil and gas would be deregulated so as to have caused an increase in price. And, the trial court found that with anticipated health and environmental restrictions on the mining of coal there was to have resulted decreased productivity and higher coal prices.

What the trial court determined to factually have occurred was that:

In 1979 and 1980 the price of world oil increased dramatically and the use of coal began to increase, but contrary to the expectations of 1978 and 1979, since 1980 there has been a downward pressure on the price of world oil and coal. There was 10% inflation in the years 1978–1981. By 1983 world oil prices had dropped to $29 a barrel from a high of $35 a barrel, and the ability of the Arab Cartel to control the price of world oil has dissolved. Oil now sells for $18–20 a barrel. Further decreases in the price of oil are now being predicted. The shortage of natural gas has been alleviated and there now exists a surplus of that fuel. After years of increased consumption, the demand for electrical power has slowed almost to a standstill. Industry and utilities are not coverting (sic) to the use of coal as expected. In addition, there is increased competition from other coal producers in the world such as Australia, China, and Columbia. The export of coal from the U.S. has decreased. The price of coal has continued downward since 1980, despite an increased use of coal by utility companies. Productivity of coal in underground mining has increased steadily since 1983. These are material and substantial changed conditions and events in the coal industry which were not expected nor foreseen

prior to the parties executing their contract in 1978.

Inflation slowed rapidally (sic) in the early 1980's and declined again in the (sic) 1986. In 1981–1982, the United States economy suffered a severe recession and overall economic growth slowed. While economic growth resumed in late 1982, energy markets remained depressed and the long-term outlook changed. Conservation efforts were far more significant than had been contemplated. Energy demand and energy prices declined. Domestic oil and gas were deregulated and, contrary to expectations, prices declined. Coal prices also declined. More natural gas became available. As oil and gas prices declined, the impetus for conversion to coal dissolved, and the expected high demand for coal never materialized even though the use of coal by utilities did increase. Despite health and environmental restrictions, productivity in the coal industry increased dramatically, further contributing to a decline in coal prices. The demand for electricity remained leveal (sic) and very few new units came on line. A few utilities went bankrupt.

The trial court stated twice as a conclusion of law "There has been an occurrence, after the effective date of this agreement, of material unforeseen events and changed conditions." The trial court went on saying that "because of such events and conditions, the existing base price as of July 1, 1984 and July 1, 1987 was inequitable to Kentucky Utilities because it was so much greater than the then existing market price of coal of like quality produced in the same general area of Seller's properties." The trial court determined the parties had gone to great lengths to assure each would be dealt with fairly if there developed material unforeseen events or changed conditions. The trial court continued:

> SECO had problems with over capacity, under production, high royalty costs, high fixed costs, high debt services, excess reserves, a lower than average percentage of recovery of clean coal from raw coal, a dwindling coal market, and a resulting buyer's market. On the other hand, it is apparent that the parties forsaw (sic) the possibility of KU paying more per ton for the coal than the then current market price because SECO was committing itself to the providing of compliance coal to KU for a period of twelve and one-half years with an option to KU of ten additional years. In addition, it was known by KU that SECO was operating an underground mine and that productivity might be lower in that type of mine than a surface strip-mining operation. KU was also aware of the height of the coal seam being mined by SECO. However, it was not the intention of the parties that SECO would charge any price that was necessary to cover whatever its costs, if the price of SECO coal was unreasonably high when compared to the then current market price of like quality coal. There is no magical formula in this contract or in the law which provides or states what the equities are in this particular case or what price those equities compel the Court to find to be reasonable, just and equitable under the contract and under all the circumstances. It is a judgment call of the Court based upon all of the evidence and considering all of the equities in light of the provisions of the contract.

The trial court further stated, "Needless to say, it is apparent that this court believes that the various contract provisions have not fairly and equitably adjusted the price of the coal from time to time as had been intended by the parties when they originally wrote and executed this contract."

Having found from the facts presented that there had occurred material unforeseen events or changed conditions that made the price being charged for the coal under the agreement to have been inequitable to KU, the trial court reduced the base price for the first review, effective July 1, 1984, from $57.00 to $45.00 per ton, and reduced the price for the next review, effective July 1, 1987, to $38.00 per ton. The trial court further awarded South East $2.5 million on its counterclaim based on certain force majeure events. KU was recognized to have the right to the funds that

had been deposited in the court pursuant to CR 67.01.

South East appealed to the Court of Appeals with its centerpiece argument being that the trial court erred in concluding there had been material unforeseen events or changed conditions which were required to be found under the coal supply agreement before there could be any adjustment to the price of coal.

The civil appeal prehearing statement (formerly CR 76.14) filed on behalf of South East indicated the appeal would not turn on an interpretation or application of a particular statute. Indeed not a single reference was made to the UCC in the listing on behalf of South East of thirteen issues upon which the appeal was taken. *See Karam v. Greentree Corp.*, Ky.App., 783 S.W.2d 78 (1990). Nonetheless, in a 2–1 decision, the Court of Appeals followed the piper to turn this case into a UCC case which it never has been. It is believed by this Court that Judge Hayes' dissent indicating this case is not a UCC case but rather one governed by the age-old principles of contract law is the correct point of departure for deciding this appeal.

■ The coal supply agreement, as an instrument for the sale of goods, does trigger the UCC. However, lost sight of was the clear fact, so concluded by the trial court, that two sophisticated parties with able and learned legal counsel, contracted away from the UCC, its definitions and interpretations. That, the parties were legally entitled to do. KRS 355.1–102(3).[1]

The coal supply agreement provides for the risk allocation agreed to by the parties. The triennial review provisions of both the price adjustment provisions and the current billing price, Section 12.01 of the coal agreement, are the nub of this controversy.

The intent of the parties, as embodied in the agreement, is paramount, not an analysis of and extension of the UCC. In the language of Section 12.01 the parties specifically addressed revision of the base price and delineated the standard to be used in such revision. The contractual standard (Section 12.01) was not based on whether the events or conditions could or should have been foreseen, but requires only a factual determination that the events or conditions were not foreseen. Section 12.01 was a negotiated provision for period price review, not an excuse from performance clause.

■ In this case the path taken from the filing of the declaration of rights action through the protracted proceedings in the trial court has not been carefully watched, and at the reviewing whether the events and conditions found by the trial court were clearly "unforeseen." It is the holding of this Court that the factual determination that they were unforeseen is not clearly erroneous. CR 52.01. *Commonwealth Transp. Cabinet v. Taub*, Ky., 766 S.W.2d 49 (1988). *See also Cook United, Inc. v. Waits*, Ky., 512 S.W.2d 493 (1974). The Court of Appeals' preoccupation with the UCC and particularly KRS 355.2–615 was unwarranted. It is difficult to imagine the parties to the agreement having intended for the provisions of Section 2–615 to be applicable to the buyer (KU) since the section expressly refers to sellers and no Kentucky appellate case before the Court of Appeals in this one has ever found, let alone hinted, at applying this provision of the UCC to *buyers*.[2]

South East's reliance, as well as that of the Court of Appeals, on cases dealing with commercial impracticability, impossibility, and related doctrines, ignores the express terms of the agreement. For example,

---

**1.** "The effect of provisions of this chapter may be varied by agreement, except as otherwise provided in this chapter and except that the obligations of good faith, diligence, reasonableness and care prescribed by this chapter may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable."

**2.** The Court of Appeals noted the 1990 Kentucky General Assembly adopted the official comments to the UCC and recognized such adoption occurred after consideration of this matter by the trial court. The Court of Appeals subscribed to the interpretation by some authorities that comment 9 makes Section 2–615 applicable to buyers.

South East has relied heavily on the case of *Northern Indiana Public Service Company v. Carbon County Coal Company,* 799 F.2d 265 (7th Cir.1986). In the *NIPSCO* case at issue was a long-term coal contract with a fixed floor price per ton, but subject to escalator provisions. The court expressly recognized its primary role as to impossibility and related doctrines. It determined such devices for shifting risks are for use when dealing with parties' presumed intentions, but such doctrines have no place when the contract explicitly assigns a particular risk to one party or the other, 799 F.2d at 278. While it is strongly believed Section 2–615 applies only to sellers, as its language states, we find it unnecessary to so conclude in this case as the language of Section 2–615 under any circumstances is not pertinent due to explicit language of the coal supply agreement. This must be the conclusion of this Court for in no other way can sense be given to the parties' stated intent in Section 12.01 that the phrase "material unforeseen events or changed conditions" was to have included matters such as the increase or decrease in the costs of producing coal, the effects of inflation or deflation and the then current market price of like quality of coal. Judge Hayes was indeed correct in stating, "If one assumes, using a Uniform Commercial Code definition, that inflation, deflation, etc., cannot constitute an 'unforeseen circumstance of changed even,' then most of the language contained in those sections that the parties bargained for is mere surplusage." Moreover, a comparison of the provisions of Section 2–615 with the price review language of the agreement (Section 12.01) refutes without reservation any notion that the review language was borrowed from the UCC and cases interpreting Section 2–615, that a difference between the billing and market prices for coal was a material unforeseen event or changed condition. We do believe, however, as did the trial court, that in keeping with Section 12.01 the difference in price was the result of material unforeseen events or changed conditions and because of such events and conditions, the billing price was inequitable. That was the one-two step procedure the

parties set out to be engaged in under Section 12.01 potentially every three years over the life of the 12 and ½ year contract that was subject to being renewed for an additional ten years. It is obvious to this Court that neither South East nor KU desired in the long term coal supply agreement to be willing to subject themselves to the risks typically associated with a pure market contract or to the converse, an agreement that made no recognition of market prices. As parties are wont to do, they word-smithed language expressing their intent as to the manner in which there could be maintained an equitable price of the coal over the life of the contract. Either party was locked into a risk situation as to the price to be paid or received for only a three year period and either party then had the right to initiate a readjustment of the price so long as the triggering contractual conditions could be satisfactorily shown to exist, i.e.: (1) that material unforeseen events or changed conditions had occurred, *and* (2) those events or conditions caused the price of the coal to be inequitable to one of the parties.

■■■ We concur with the Court of Appeals' thorough examination of the second primary issue presented, that of the appropriateness of the invocation by KU of the force majeure provisions of the agreement. For this reason, we adopt that portion of the opinion of the Court of Appeals:

"The second major issue concerns KU's claims of 36 force majeure events. SECO argues that the court erred by approving KU's improper invocation of force majeure and refusal to take delivery of several hundred thousand tons of coal. The trial court partially disallowed KU's claim of force majeure on three events and awarded SECO approximately $2,500,000 on its counterclaim. SECO seeks a greater award, and we remand this action for further consideration of some of the events. KU counters part of SECO's claims by contending that the trial court erred in rejecting its formula to calculate tonnage attributable to partial outages. We disagree and affirm the court's handling of the derate events."

"*Webster's New Twentieth Century Dictionary Unabridged,* 716 (2d ed. 1970), defines 'force majeure' as '1. overpowering force. 2. in Roman law, an act of God.' *Black's Law Dictionary* 645 (6th ed. 1990), defines "force majeure" as:"

In the law of insurance, superior or irresistible force. Such clause is common in construction contracts to protect the parties in the event that a part of the contract cannot be performed due to causes which are outside the control of the parties and could not be avoided by exercise of due care. An oil and gas lease clause that provides that the lessee will not be held to have breached the lease terms while the lessee is prevented by *force majeure* (literally, 'superior force') from performing. Typically, such clauses specifically indicate problems beyond the reasonable control of the lessee that will excuse performance. *See also* Act of God; Vis major.

"In the contract, at Section 11.01, the parties defined force majeure as:"

a cause reasonably beyond the control of the Seller or Purchaser, as the cause may be, which wholly or in substantial part prevents the completion of construction of the processing or loading facilities, the mining, loading or delivery of coal at or from the Coal Property, or the unloading, storing or burning of coal by Purchaser at its destination. Examples (without limitations) of force majeure, but only if reasonably beyond the control of the Seller or Purchaser, as the case may be, are the following: acts of God; acts of the public enemy; insurrections; riots; strikes; labor disputes; work stoppages; fires; explosions; floods; *equipment breakdown or outage (including scheduled outages for maintenance);* electric power failures; interruptions to or contingencies of transportation; embargoes; and orders or acts of civil (including, without limitation, a city or county ordinance, an act of a state legislature and an act of the United States Congress) or military authority. *In the event force majeure prevents the unloading, storing or burning of coal by Purchaser at the destination or desti-nations to which the coal is then being shipped, Purchaser shall consider what steps can be taken in the transportation and utilization of the coal, including diversion of the coal to other of its plants so as to allow the coal to be used by Purchaser, and if such steps can be accomplished without unreasonable cost or expense, in Purchaser's sole opinion, Purchaser shall promptly take such steps.* (Emphasis added.)

"On page 4 of the court's July 13, 1989, opinion, we read:"

KU had the legal duty to purchase the tonnage contracted for under the SECO contract unless there were valid force majeures relating to unit 3 which suspended this obligation—which excused KU's non-performance. By contract these force majeures had to be reasonably beyond the control of KU and they had to wholly or partially prevent the unloading, storing, or burning of coal at its destination. Also, by contract, force majeures could suspend KU's obligations only to the *extent necessary;* KU had the duty *to eliminate them* as soon as possible; and KU had to consider if it could divert and use SECO coal at any other of its *plants without unreasonable cost.* (Emphasis in original.)

"On pages 10–11 of the same opinion, we further read:"

By Section 11.01, the parties agreed that an equipment breakdown or outage (including scheduled outages for maintenance) is a force majeure event *but only if reasonably beyond control of purchaser, KU or seller (SECO).* By defining force majeure in the contract and in the letter amendment in March 1982, the parties agreed that an equipment breakdown or outage (including scheduled outages for maintenance) do 'wholly or partially prevent the unloading, storing or burning of coal by purchaser at its destination.'

A determination which the Court must make in the event of an equipment breakdown or scheduled outage for maintenance is whether it was reasonably beyond the control of the purchaser, but

not whether it prevented the unloading, storing, or burning of coal by KU. The parties agreed in the contract that if it was reasonably beyond the control of KU then the event did wholly or in part prevent either the unloading, storing, or burning of coal at its destination. The Court will now make the determination whether any or all of force majeure events were valid events and whether any or all of same were reasonably beyond the control of KU. In addition, the Court will decide the extent of each valid force majeure.

"Before we embark upon a discussion of the force majeure events, we emphasize that the definition of force majeure set forth in the contract is much broader than that commonly seen in case law. While we have not made a complete analysis of case law force majeure, we do note that a force majeure event is commonly considered to be caused by overpowering, superior, or irresistible force, such as an act of God, which is beyond the reasonable control of the parties and cannot be avoided by the exercise of due care."

"Thus, scheduled outages for maintenance are not normally legitimate force majeure events. However, parties are free to set forth the terms they desire in a contract. This contract was heavily negotiated by able attorneys and executives on both sides. The terms of the contract appear to have been the result of an arm's length transaction."

"The trial court placed considerable emphasis on course of performance or practical construction in KRS 355.2-208. This section provides that an accepted or acquiesced-in course of performance is relevant to determining the meaning of an agreement. The section continues that the terms of the agreement and course of performance should be construed whenever reasonable as consistent with each other. When the construction is unreasonable, the express terms control course of performance. A course of performance is relevant to show a waiver or modification of any contract term which is inconsistent with that course of performance. In KRS 355.2-209(5), we read:"

A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

"The trial court determined, 'SECO accepted the benefit of KU's performance under the agreement, and never questioned the validity of KU's force majeure declaration until the filing of its counterclaim. That counterclaim was filed after twenty separate declarations of force majeure and nearly seven years of performance under the agreement.' "

"On page 42 of the July 13, 1989, opinion, we read:"

The Court finds and reaffirms the fact that the parties did have a continuing course of performance with regard to the force majeure events prior to the filing of the counterclaim by SECO. The parties recognized at all times that the annual boiler inspection, maintenance, repair and inspection and/or repair of the barge unloader, turbines, and equipment and machinery in general, which when damaged or out of operation resulted in KU's inability to unload, store or burn coal, resulted in valid events of force majeure. According to the terms of the contract, KU was legally entitled to declare a force majeure and to take out of the contract tonnage a pro rata amount of the monthly ratable delivery of coal which KU was accepting from SECO.

"The trial court also concluded force majeure events 1 through 4 were barred by the statute of limitations. We have carefully reviewed each force majeure event, numbers 1 through 20, and the applicable law and affirm the trial court's decision regarding both the statute of limitations and course of performance for those 20 events."

"SECO filed a counterclaim on March 14, 1985, alleging wrongful force majeures.

This was following event 20. KRS 355.2–209(5) allows a party to retract a waiver by reasonable notification received by the other party that strict performance will be required of any term waiver. We believe the counterclaim would be one example of such notification."

"Events 21 through 36 are as follows:"
21  boiler tube maintenance
22  barge unloader maintenance
23  boiler inspection for insurance
24  slag removal from boiler
25  boiler tube failure
26  boiler inspection and cleaning of tubes
27  boiler tube failure
28  barge unloader maintenance
29  pipe hanger failure
30  boiler tube failure (derate)
31  pipe hanger failure
32  barge unloader maintenance
33  air heater maintenance (derate)
34  boiler inspection
35  feed water heater, pipe hanger, boiler tube leak, and other repairs
36  barge unloader maintenance

"SECO offered alternate unloading methods at no extra cost to KU for barge unloader events 22 and 28. SECO also contested force majeure on barge unloader event 32 by proposing make-up shipping dates, and by denying the validity of event 36 on grounds previously stated."

"The analysis of force majeure under the agreement requires three steps. This analysis is similar in principle to that used by the trial court. The first question is whether there has been an event that meets the definition. Secondly, we ask was the event reasonably beyond the control of KU? Finally, we must consider whether KU could have utilized the coal without unreasonable cost or expense. The agreement allows KU to take this last step in 'Purchaser's sold opinion.' However, we conclude that KU was obligated under KRS 355.1–203 to use good faith in invoking force majeure. Good faith is 'honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.' KRS 355.2–103(1)(b). KU was also

under a contractual obligation to eliminate the disabling effects of such force majeure as soon as, and to the extent, possible. *See Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259 (10th Cir.1988)."

"Review of the force majeure event is more complex than simply determining if it did occur. Therefore, we shall review barge unloader event 22 and those afterwards to determine if the court abused its discretion or erred in reaching its conclusion. In discussing event 9, which reasoning would be applicable to the trial court's analysis of event 22, the trial court wrote, 'The Court has held that KU was not required to accept this alternative method of delivery [conveyor system] as it was contrary to the agreement between the parties.' In applying the three-part test, we believe the maintenance and repair of the barge unloader were definitely included in the force majeure clause. The maintenance and needed repairs were reasonably beyond the control of KU. The third part is more critical—could KU utilize the coal without unreasonable cost or expense, in KU's sole, but good faith, opinion."

"Considering that KU was to use good faith and eliminate the disabling effects of such events as soon as and to the extent possible, we believe KU's refusal to accept the free conveyor belt for unloading offered by SECO at event 9 and the alternate methods offered by SECO at events 22 and 28 raises serious questions. The trial court specifically found at event 9 that the conveyor belt would have had an unknown effect, but the court later concluded KU's rejection of SECO's conveyor system was permitted by the terms of the agreement. We do not fully agree, but we affirm the decision on event 9. However, as to barge unloader events 22, 28, 32, and 36, we remand for a further determination of whether KU considered what steps it could take without unreasonable cost or expense to utilize SECO's coal. We know that it was KU's decision not to take the coal, but we do not know whether KU even considered in good faith if it could transport or divert the coal for use at its other generators without unreasonable cost or expense.

If the problems with the barge unloader would be resolved in KU's good faith determination, without unreasonable cost or expense to KU, then it should have accepted SECO's delivery solution and its coal."

"Next, we will consider events 30 and 33 involving derating. KU argues that the trial court erred in rejecting the formula used by the parties to calculate tonnage attributable to the partial outages. We disagree."

"During discovery, SECO learned for the first time that KU had burned substantially all the contract tonnage in Unit 3 during five different occasions when force majeure had been declared. Before discovery, SECO believed KU was unable to burn the contract tonnage because of the derate. SECO did not waive its right to contest the calculations, because it was not properly informed by KU. To rely on estoppel principles requires honesty in fact and good faith by the party claiming estoppel. KU could not burn in Unit 3 an amount of coal equal to or greater than contract tonnage, which it purchased from other sources, and then refuse to accept delivery of the same amount of coal from SECO. Although SECO was not the sole supplier of low-sulfur compliance coal for KU, KU had an agreement to purchase 900,000 tons of such coal annually from SECO. Furthermore, we note that although the SECO contract was to furnish coal primarily for Ghent Number 3, it was not exclusively for that generator. SECO coal could have been, and at times was, burned in other generators."

"Ghent Number 3 is rated at 511 megawatts (MW) per hour. If it burned at full capacity the entire year, it would burn 1,947,975 tons or 222.37 tons per hour. If the generator burned at a constant 236 MU per hour, it would burn 102.7 tons per hour or about 900,000 tons per year. This is equal to the contract amount of 900,000

tons. The trial court held that KU was not entitled to claim force majeure events which involve a derate when KU was able to burn most of the contract tonnage in Unit 3 and did in fact burn most of the contract tonnage in Unit 3 while it was in a derate status. We agree and affirm the trial court's decision on this point involving events 30 and 33."

"We have reviewed events 21, 23, 24, 25, 26, 27, 29, 31, and 35. We find no error in the trial court's conclusion that these were permitted force majeures under the contract terms. We affirm on those events, plus events 1 through 20, and we affirm the $2.5 million award to SECO on its counterclaim. However, we remand for further consideration consistent with this opinion on events number 22, 28, 32 and 36."

As previously pointed out, the lawsuit by KU was to enforce the provisions in the coal supply agreement for triennial price review. KU filed a motion in the trial court for leave to deposit in court that part of the future billing price that was in dispute. The purported basis for KU's motion was CR 67.01.[3] The trial court held an eight day evidentiary hearing on the issue of whether to permit KU to deposit such funds with the court. The trial court determined in 1985 that KU had a substantial likelihood of succeeding on the merits and further that under such circumstances as extant in this case, CR 67.01 was "broad enough to include the relief requested by Kentucky Utilities."

The consortium of banks, permitted intervenors in the trial court, and South East argued before the Court of Appeals that the trial court had erred in permitting KU to deposit a portion of the billing price into the court pending final judgment. The Court of Appeals acknowledged the issue regarding CR 67 to be very important and one of first impression in Kentucky, but declined to address it in part based upon

3. "In an action which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing. Money paid into court under this rule shall be deposited in an interest-bearing account or invested in an interest bearing instrument approved by the court. At the conclusion of the action, the interest accruing on any such account or instrument shall be paid to the person to whom the principal amount of the account is paid."

the notion that in practical effect the issue was moot. The Court of Appeals did note in passing that few courts allow what the trial court had done, "and then only some federal courts plus a few states which have adopted a rule similar to Fed.R.Civ.P. 67 as amended in 1983." Having granted discretionary review in this case, we feel the CR 67 issue is ripe for a first blush decision in this case. Certainly South East's attempt to obtain the release of the deposited funds while this matter has been pending in this Court belies any notion the issue is moot.

■ The trial court, while stating it believed CR 67 to be broad enough to grant the relief requested by KU, also relied upon its broad equity powers to grant the interim relief and to preserve a fund in dispute. We conclude the provisions of CR 67 standing alone may be used as the basis for the reasonable exercise of a trial court's discretion, under appropriate factual circumstances, to preserve a fund in dispute.

■ Significant to having applied CR 67.01 to this case is the simple fact that the deposited funds were not proceeds under the contractual agreement, but rather funds that were in dispute under the agreement. Although we do not find it essential to applying CR 67.01, it is believed a trial court should consider a would-be depositor's likelihood of success on the merits when the motion to deposit is filed. Also to be considered by a trial court is the likelihood of the would-be depositor recovering the disputed funds if the court does not permit them to be preserved by depositing them with the court. Under appropriate facts, the granting of a motion for leave to deposit disputed funds in the court "is a practical and sensible temporary solution" which minimizes "the financial risk for both parties." *Precision Shooting Equipment Co. v. Allen,* 646 F.2d 313, 321 (7th Cir.1981).

South East and the banks have argued that to permit CR 67 to be used as it was in this case amounted to pre-judgment attachment. This position could only be accepted if it had been shown the sums of money in issue were clearly the property of South East.

Consequently, we affirm the trial court's reliance upon CR 67.01 to order the disputed sums under the coal supply agreement to be deposited in the court.

Of the several additional issues decided by the Court of Appeals we believe it to be necessary only to discuss two. KU had sought reviews, prior to filing the declaration of rights actions, under both Section 12.01(1) *and* Section 12.01(2). The Court of Appeals, having concluded the trial court had erred in exercising authority to revise the base price provision of the coal supply agreement under Section 12.01(2), also concluded the trial court had no authority to consider the revision of the base price adjustment provisions (Sections 4.03–4.09) pursuant to Section 12.01(1). Both provisions of Section 12.01 required adjustment, on an equitable basis, because of the occurrence of material unforeseen events or changed conditions. For the reasons previously stated, we believe the Court of Appeals' analysis of these provisions of the coal supply agreement was incorrect. The conclusion of the trial court as to the price adjustment provisions is affirmed. By doing so we reject KU's argument that the trial court had authority to set new prices between triennial reviews. We believe the intent of the parties is expressed to the contrary by the language used in Section 12.01(1). We, moreover, do not believe the trial court's findings of fact and conclusions of law in this regard are clearly erroneous. CR 52.01.

■ We affirm the opinion of the Court of Appeals in reversing the trial court's failure to award KU recovery of royalty overcharges. We again concur with the Court of Appeals' thorough examination of this issue and adopt that portion of its opinion:

KU next argues that the trial court erred in not awarding it recovery of royalty overcharges. Section 4.06(a) of the agreement provides:

The Royalty component of the base price provided in paragraph 4.01 hereof is the actual average royalty ex-

pense of Seller incurred for all No. 4 seam coal being sold as of the effective date of this agreement, including coal mined from the No. 4 seam from the Line Fork property and from other properties of Seller. It is the intention of the parties that the Royalty Component of the base price shall equal the actual royalty obligation of Seller for coal mined and sold to Purchaser under terms of this agreement.

SECO paid an additional royalty to the lessor of coal, if the price of the coal from Line Fork Mine exceeded $35 per ton. SECO blended Breeding Creek and Line Fork coal and sold it to KU. Since KU paid over $35 per ton for its coal, it reimbursed SECO for the extra royalty on Line Fork coal. However, SECO averaged the price of all Line Fork and Breeding Creek coal and paid the lessors on an average sale price, which did not exceed $35 a ton. The trial court stated, "as a result, SECO is obtaining more money from KU than it pays out to the lessors on coal sold to KU." There was evidence presented that KU paid more in royalties than the total paid by SECO for all the coal it sold in each year from 1982 through 1986.

The trial court held the initial adjustment to be a binding course of performance and denied KU relief. KU contends that both the initial adjustment and its later request for relief were consistent with the contract's language that KU's royalty payments equal the actual royalty obligation of SECO. We agree.

Considering the fact that KU waged a long battle to keep the price of coal from SECO at a bare minimum, we find it difficult to believe that it knowingly paid excess royalty payments above the stated amount in the agreement. KU claims in its brief that it was unaware before 1984 of such overpayments.

The trial court determined:

> [T]he calculations were not in accordance with the terms of the contract. However, KU and SECO established a course of performance consistent with KRS 355.2–208 which, over the initial six years of the agreement, has risen

to the legal status of a waiver under KRS 355.2–209(4).... The court will not now alter the meaning of the contract as established by the course of performance by the parties during that period of time. The calculation of royalty in the future will be calculated in the same manner.

We believe this is clear error of fact and law. KRS 355.2–209(5) allows the retraction of a waiver by reasonable notification to the other party that strict performance will be required of any term waived.

We reverse the trial court on its holding that royalties "in the future will be calculated in the same manner." KU's request for relief was prospective from July 1, 1984. The trial court should have enforced the terms of the contract and adjusted the billing price royalty component to "the actual royalty obligation of the Seller ..." for those sales to KU after July 1, 1984. On remand, this adjustment must be calculated in to the final award.

The opinion of the Court of Appeals is affirmed in part, reversed in part and this case is remanded to the trial court for further proceedings consistent with this opinion.

STEPHENS, C.J., not sitting.

ROBERT L. CHENOWETH, Special Justice, and COMBS, LEIBSON, SPAIN and WINTERSHEIMER, JJ., concur.

LAMBERT, J., dissents in a separate dissenting opinion in which REYNOLDS, J., joins.

LAMBERT, Justice, dissenting.

The decision of the majority should chill the hearts of business persons throughout Kentucky for it stands for the proposition that detailed contracts may be rewritten by judges on a "judgment call" to accommodate their views of equity. As virtually every contract contains some escape clause which excuses performance upon the occurrence of "material unforeseen events," or some such descriptive phrase, parties may no longer rely upon the strict enforcement

of their contracts if subsequent events do not transpire as had been expected.

While the trial court wrote more than a hundred pages and the Court of Appeals wrote forty more, the principal issue here is not that complicated. The issue is whether, as a matter of law, the failure of an economic forecast to accurately predict future market behavior amounts to a material unforeseen event which excuses performance of a contract. The majority has held that it does.

South East Coal Company (SECO) entered into a long-term contract with Kentucky Utilities (KU) for the supply of compliance coal. KU needed to have a dependable supply of such coal to avoid expensive capital expenditures in the form of scrubbers upon its generating units at Ghent. To meet the requirements of the KU contract, SECO expanded its holdings of compliance coal and invested heavily in plant and equipment. The original contract price was $43 per ton, a price in excess of the existing market price, but the lowest delivered price from a single, domestic-origin supplier. The parties' contract called for upward and downward adjustment of the price per ton based on SECO's production cost and published indices. About five years into the contract and in accordance with its adjustment provisions, the price had risen to nearly $57 per ton, but during the same period, the market or "spot" price of such coal had declined. KU sued seeking a $19 per ton reduction in the contract price.

KU based its claim on a provision of the contract which permitted review prior to the end of every third year to determine whether price adjustment was required "... because of the occurrence ... of material unforeseen events and changed conditions." While recognizing that KU expected to pay in excess of the market price due to the underground production and its need for a dependable supply, and while recognizing that SECO had and would incur vastly greater costs due to its commitment to KU, the trial court nevertheless held that the difference between the contract price and the market price satisfied the contract requirement and granted KU a substantial price reduction.

As grounds for its ruling, the trial court found that the parties expected the price of coal to rise during the term of the contract and that failure of the market to behave as they had expected authorized relief. Its view is curious, however, due to a statement in the same opinion that "historically the price of coal fluctuates up and down. There have always been highs and lows in the production, in the use, and in the price of coal which is mined in Eastern Kentucky. This is not unforeseen nor unexpected."

The contract of the parties was an enormous undertaking for SECO and for KU as well. To justify such, long-term and dependable performance was necessary. In disregard of the foregoing, the construction placed on the contract by the trial court essentially converted it from twelve and a half years to three years. By construing price fluctuations as material and unforeseen events, the trial court effectively held that the contract should be renegotiated every three years, contrary to the manifest intention of the parties.

In final analysis, this case boils down to KU's seizure of an opportunity to make a greater profit by breach of its contract, and at the expense of its fuel supplier. At the time the contract was entered, KU expected fuel costs to increase. If the market had performed as it expected, KU would have demanded performance of the contract as written. When the price of fuel declined, however, KU did not suffer any rate reduction or any other economic detriment, but it seized the opportunity to enhance profit without regard to the disaster it wrought on SECO. As recent as 1991, we wrote in *Ranier v. Mt. Sterling National Bank*, Ky., 812 S.W.2d 154, 156 (1991), that

> "In every contract, there is an implied covenant of good faith and fair dealing. (Citation omitted.) Indeed, it may be said that contracts impose on the parties thereto a duty to do everything necessary to carry them out."

Our decision in this case is a retreat from the high principles we embraced just last year.

For a comprehensive and scholarly treatment of the issue presented here, the decision of the United States Court of Appeals for the Seventh Circuit, *Northern Indiana Public Service Company v. Carbon County Coal Company*, 799 F.2d 265 (7th Cir. 1986), should be consulted. This decision, by Judge Richard A. Posner, is factually similar to the case at bar and legally indistinguishable. The public utility sought to be excused from performance of its fixed price coal supply agreement after escalation provisions in the contract had nearly doubled the price and the rate commission had denied an increase. Denying relief, the Court perceptively analyzed the parties' circumstances and required them to lie in the beds they had made. Of particular significance was the willingness of the utility to agree to a fixed price and fixed quantity to assure supply of low sulphur coal. As such, risk of price fluctuations was held to be inherent and a central term of the contract. The Court said:

> "It [the utility] committed itself to paying a price at or above a fixed minimum and to taking a fixed quantity at that price. It was willing to make this commitment to secure an assured supply of low-sulphur coal, but the risk it took was that the market price of coal or substitute fuels would fall. A *force majeure* clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed-price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller (except insofar as escalator provisions give the seller some protection); if it falls, as here, the seller gains at the expense of the buyer. The whole purpose of a fixed-price contract is to allocate risk in this way. A *force majeure* clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract." *Id.* at 275.

. . . .

> "If, as is also the case here, the buyer forecasts the market incorrectly and therefore finds himself locked into a disadvantageous contract, he has only himself to blame and so cannot shift the risk back to the seller by invoking impossibility or related doctrines." *Id.* at 278.

The majority opinion of the Court of Appeals, with the concurrence of three of the four judges participating,[1] precisely analyzed this case and I adopt the view expressed therein:

> "We do not agree that the factors cited by the court are material unforeseen events, nor do we believe that KU met the commercial impracticability threshold. The fact that the price of compliance coal on the spot market did not increase as had been predicted by some economists so as to make the contract price advantageous to KU, cannot be the basis of a claim of commercial impracticability. As earlier noted, the court found that the contract price accurately reflected SECO's cost and inflation. If the price of coal had gone up to $85/ton as had been predicted, KU would have considered that it had a bargain in the contract; although, presumably, SECO's contract prices would have risen somewhat, since they were tied partially to pass-through costs and partially to certain designated indices. The stated reason for KU to enter into the contract was the need for a long-term contract for the supply of low-sulphur coal and as a hedge against expected increases in costs of procuring this compliance coal. The chance that the market would go the other way is a risk that the parties took in entering into such a contract." Court of Appeals Opinion at p. 17.

For the reasons stated, I dissent.

REYNOLDS, J., joins in this dissenting opinion.

---

**1.** After rendition of the opinion of the Court of Appeals, but before any ruling on KU's petition for rehearing, Judge Judy M. West died. Judge John D. Miller was thereafter designated as presiding judge of the panel for purposes of ruling on the petition for rehearing. Judge Miller concurred in the majority opinion by Judge Howerton.